**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**GEORGE M. CHAVIS,**

**Plaintiff,**

**v.**                                                                                    **9:03-CV-0039**
                                                                                               **(FJS/RFT)**

**G. KIENERT, Deputy of Programs; C.O. DUMAS, SHU**
**(Disciplinary); C.O. DONOVAN, SHU (Disciplinary);**
**R. GIRDICH, Prison Superintendent; A. BOUCAUD,**
**Deputy of Administration; D. SELSKY, SHU Disciplinary**
**Director; R. DONALDSON, Civilian Grievance Supervisor;**
**MS. DAGGETT, SHU Corrections Counselor; L. FRIOT,**
**Senior Corrections Counselor; A. TOUSIGNANT, Prison**
**Nurse Administrator; Ms. BUFFMAN, Medical Staff "PA";**
**DR. L.N. WRIGHT, Chief Medical Officer; C.O. J. ROCK,**
**Hearings; J. DONELLI, Deputy (First) Superintendent;**
**LUCIEN J. LeCLAIRE, Deputy Commissioner; J. CROMP,**
**Grievance Officer; C.O. M. WHITE, SHU; C.O. G. CANNING,**
**Hearings; MR. JOHNSON, Prison Doctor; C.O. M. YUDDOW,**
**SHU; and RICHARD D. ROY, Inspector General's Officer,**

**Defendants.[1]**

_____

**APPEARANCES**                                                     **OF COUNSEL**

**GEORGE M. CHAVIS**
**91-A-3261**
Southport Correctional Facility
P.O. Box 2000
Pine City, New York 14871
Plaintiff _pro se_

_____

[1] In his complaint, Plaintiff incorrectly refers to Defendant "Johnston" as "Johnson." The Court will refer to this Defendant as "Johnston." Furthermore, although Plaintiff refers to this Defendant as a Doctor, according to Defendant Johnston's Declaration, which Defendants submitted in support of their motion for summary judgment, Defendant Johnston is a Physician's Assistant. _See_ Dkt. No. 72, P. Johnston Decl., at ¶ 1. Plaintiff also incorrectly refers to Defendant "Yaddow" as "Yuddow;" the Court will refer to this Defendant as Yaddow.

**OFFICE OF THE ATTORNEY GENERAL**                KATE H. NEPVEU, AAG
**OF THE STATE OF NEW YORK**
The Capitol
Albany, New York 12224-0341
Attorneys for Defendants

**SCULLIN, Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On January 9, 2003, Plaintiff George M. Chavis filed his complaint in this civil rights action,

pursuant to 42 U.S.C. § 1983, against twenty-one Defendants, alleging that, during the time that he

was incarcerated at Upstate Correctional Facility, Defendants violated his rights under the First,

Eighth, and Fourteenth Amendments. *See* Dkt. No. 1. Specifically, Plaintiff alleges that

Defendants, collectively and individually, (1) denied him access to the courts when they confiscated

his legal mail, denied him access to the law library, and refused to file grievances that he submitted;

(2) retaliated against him in various ways, whether by issuing false misbehavior reports or by

extending his confinement in a Special Housing Unit ("SHU"); (3) violated his due process rights at

various disciplinary hearings; (4) were deliberately indifferent to his serious medical needs; and (5)

housed him in inhumane living conditions. *See id.*

Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure. *See* Dkt. Nos. 72, 78, & 79. Plaintiff opposes this motion.

*See* Dkt. No. 75.[2] For the reasons set forth herein, the Court grants Defendants' motion and

_____

[2] At the outset, the Court notes that Plaintiff's opposition papers substantially fail to comply
with this District's Local Rules in that Plaintiff (1) failed to include a Statement of Material Facts,
(2) included legal arguments in his Affidavit, and (3) submitted a legal memorandum, which, at
sixty pages, far exceeds the twenty-five page limit. *See* L.R. 7.1(a). Although the Court could have

(continued...)

-2-

dismisses Plaintiff's complaint in its entirety.

## II. BACKGROUND[3]

Plaintiff's claims arise from incidents that occurred during the time that he was incarcerated in Upstate Correctional Facility's SHU between July 1 and December 31, 2002. *See generally* Dkt. No. 1. On July 1, 2002, Plaintiff was transferred to Upstate Correctional Facility and was housed in SHU to serve a keeplock sentence imposed at a March 7, 2000 Tier II Disciplinary Hearing held at Coxsackie Correctional Facility. *See* Dkt. No. 72, Kate Nepveu, Esq., Decl., dated December 31, 2004, Exhibit "B," Inmate Disciplinary History, at renumbered p. 3.[4] Plaintiff was to serve the keeplock sentence from June 27 to July 27, 2002.[5] *See id.*; *see also* Dkt. No. 72, Defendants' 7.1

---

[2](...continued)
rejected Plaintiff's papers as non-compliant, in light of his *pro se* status, the Court accepts his filings. However, the Court will construe Plaintiff's voluminous response to Defendants' motion, entitled "Affidavit in Testimony," *see* Dkt. No. 75, as a Memorandum of Law in Opposition because this District's Local Rules preclude an affidavit from including legal arguments. *See* L. R. 7.1(a)(2). There is no prejudice to Plaintiff as a result of the Court's recharacterization of his papers because his verified complaint may serve as an affidavit for summary judgment purposes. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing cases and treatises supporting the proposition that a verified complaint may serve as an affidavit for Rule 56 purposes provided the complaint "contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity").

[3] The Court derives the facts from Defendants' Statement of Material Facts, which they submitted in accordance with L.R. 7.1 and which Plaintiff has not specifically countered or opposed and which the record amply supports. *See* L.R. 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").

[4] In submitting Exhibits in support of Defendants' motion for summary judgment, Defendants' counsel renumbered the pages of all of the Exhibits. For ease of reference, the Court will refer to the relevant Exhibits using their renumbered designations.

[5] Plaintiff's disciplinary history since his admission to the custody of New York's Department of Correctional Services ("DOCS") is rather lengthy. Some examples of Plaintiff's vast disciplinary

(continued...)

Statement at ¶ 1.

The Upstate Medical Staff received information from Southport Correctional Facility indicating that Plaintiff suffered from Hepatitis B, asthma, and chronic seasonal allergies as well as allergies to penicillin and seafood.[6]  *See* Nepveu Decl., Exhibit "K," Chavis Medical Record, at p. 49.  The only medications noted were multi-vitamins.  *See id.*  Upon admission to Upstate Correctional Facility, Plaintiff completed a medical questionnaire regarding his allergy to seafood.

---

[5](...continued)
history include the following:

> (1) from 1993 to 1996, while housed at Clinton Correctional Facility, Plaintiff was found guilty of various prison rule violations at eight separate disciplinary hearings (two Tier III and six Tier II);
> (2) from 1997 to 1998, while housed at Attica Correctional Facility, Plaintiff was found guilty at five separate disciplinary hearings (one Tier III and four Tier II);
> (3) from 1998 to 2000, while housed at Wende, Orleans, and Southport Correctional Facilities, Plaintiff was found guilty at five separate disciplinary hearings (two Tier III and three Tier II);
> (4) in 2000, while housed at Coxsackie Correctional Facility, Plaintiff was found guilty at six separate disciplinary hearings (four Tier III and two Tier II);
> (5) from 2000 to 2002, while housed at Southport Correctional Facility, Plaintiff was found guilty at nine separate disciplinary hearings (two Tier III and seven Tier II); and
> (6) from July through December 2002, while housed at Upstate Correctional Facility, and the focus of some of Plaintiff's claims herein, Plaintiff was found guilty at six separate disciplinary hearings (three Tier III and three Tier II).

*See* Nepveu Decl., Exhibit "B."

[6] The report further noted that, although Plaintiff had never been referred to a mental health unit, he had a psychiatric history, including a history of violence.  *See* Nepveu Decl., Exhibit "K," at p. 49.

*See id.* at pp. 52-53.  Based upon his responses to the medical questionnaire, A. Branch,[7] DOCS

Registered Dietitian, responded that the facility only served fish, not shellfish, and that the facility

would provide Plaintiff with a substitute for fish.  *See id.* at pp. 51-52.  On October 22, 2002, the

facility formally executed a Therapeutic Diet Request Form and Attendance Agreement.  *See id.* at

p. 50.

On July 3, 2002, while serving the above referenced keeplock sentence, Plaintiff wrote a

letter, addressed as "legal mail," to Stephen F. Gawlik, Assistant Attorney General ("AAG").  *See*

Defendants' 7.1 Statement at ¶ 3; Nepveu Decl., Exhibit "C," July 26, 2002 Hearing Packet, at p. 6.

The letter included language such as

> neither one of your vindictive KKK clients will get away with it.  I'll
> seek everyone out and put them each under the fucken [sic] dirt
> w/their devils (illegible).  I will get retribution on everyone [sic] of
> you because I know that all of you are in this together, but you'll pay
> for it.

*See id.* at p. 8.

Due to the threatening nature of the letter, AAG Gawlik forwarded it to facility officials for

investigation.  *See* Nepveu Decl., Exhibit "C," at p. 6.  On July 12, 2002, after interviewing Plaintiff,

who admitted writing the letter, Defendant G. Canning wrote a misbehavior report charging Plaintiff

with violating prison rules 102.10 (threats in writing), 107.11 (inmates shall not harass any person),

and 180.11 (correspondence procedures).  *See id.* at p. 16.[8]  Defendant J. Rock, Lieutenant, presided

as the hearing officer at a Tier III Superintendent's Hearing regarding this misbehavior report on

---

[7] Branch is not a Defendant in this action.

[8] Defendants' 7.1 Statement incorrectly states that Defendant Canning's misbehavior report is dated August 26, 2002.  *Compare* Defendants' 7.1 Statement at ¶ 8 *with* Nepveu Decl., Exhibit "C," at p. 16.

July 26, 2002. *See* Nepveu Decl., Exhibit "C," at p. 2. Defendant Rock found Plaintiff guilty of

violating prison rules regarding harassment and threats and instituted a punishment of twelve

months' confinement in SHU with corresponding loss of privileges and further recommended nine

months loss of good time.[9] *Id.* In his written statement of disposition, Defendant Rock explained

that, in light of Plaintiff's lengthy disciplinary history, of which thirteen disciplinary dispositions had

been issued since January 2000 for threats and harassment, and in light of the fact that Plaintiff had

exhibited no modification to his behavior, a more severe sentence was warranted. *See id.* at p. 3; *see*

*also supra* note 5. Defendant Rock further noted that Plaintiff had refused assistance from

Defendant Daggett, his selected hearing assistant, and had refused to attend the hearing. *See id.*; *see*

*generally* Nepveu Decl., Exhibit "D," July 26, 2002 Hearing Transcript. The disciplinary

disposition, which Defendant Selsky affirmed on appeal, was set to commence on March 4, 2003,

and end on March 4, 2004.[10] *See* Nepveu Decl., Exhibit "C," at pp. 1-2.

On August 21, 2002, Plaintiff wrote a letter to Defendant A. Tousignant, Prison Nurse

Administrator, in which he referred to Defendant Nurse Buffman an "ill-minded lesbian dyke of a

deeply rooted perverted mentality" and a "KKK staff member . . . [who] hand masturbates SHU-

inmates through the access door." *See* Nepveu Decl., Exhibit "E," Sept. 5, 2002 Hearing Packet, at

pp. 6-8; Defendants' 7.1 Statement at ¶ 7. In response, on August 26, 2002, Defendant Tousignant

wrote a misbehavior report charging Plaintiff with violating prison rule 107.11 (harassing

---

[9] Defendant Rock found Plaintiff not guilty of violating facility correspondence rules because his letter was addressed to the Attorney General's Office and some of its content was legal in nature. *See* Nepveu Decl., Exhibit "C," at p. 2.

[10] According to Plaintiff's Inmate Disciplinary History, the service dates for this disposition commenced on July 26, 2002, and ended on July 26, 2003. *See* Nepveu Decl., Exhibit "B," at p. 1. The parties have not submitted any reason for the discrepancy in service dates.

employees). *See* Nepveu Decl., Exhibit "E," at p. 5.  On September 5, 2002, Defendant Canning presided over a Tier II Disciplinary Hearing regarding this misbehavior report. *See id.* at p. 1.  At the close of the hearing, Defendant Canning found Plaintiff guilty and sentenced him to thirty days keeplock and loss of privileges. *See id.*  Plaintiff did not appeal this disposition. *See* Nepveu Decl., Exhibit " ,"at p. 1.

Between September 6, 2002, and November 12, 2002, Plaintiff received misbehavior reports charging him with violating prison rules 102.10 (threats), 106.10 (direct order), and 109.12 (movement violation). *See id.*  Two separate Tier III Superintendent's Hearings were held, after which Plaintiff was found guilty and sentenced to sixty  days' confinement in SHU with loss of privileges and nine months' confinement in SHU with loss of privileges, respectively. *See id.*  The latter punishment included nine months recommended loss of good time.[11]  *Id.*; Defendants' 7.1 Statement at ¶ 10.  Plaintiff did not appeal either of these dispositions. *See* Nepveu Decl., Exhibit "B," at p. 1; Defendants' 7.1 Statement at ¶ 11.

On September 8, 2002, Plaintiff submitted a grievance to the Inmate Grievance Resolution Committee ("IGRC"), which was filed on September 20, 2002, and designated UST 13378-02. *See* Nepveu Decl., Exhibit "I," Inmate Grievance Packet–UST 13378-02, at p. 13.  In his grievance, Plaintiff complained that on September 5 and 6, 2002, during the morning mail pick-up in SHU, four SHU officers "willfully denied [him] replacement facility envelopes" in exchange for personal envelopes and "further denied [him] other stationary [sic] supplies, *i.e.*, paper and pens," thereby preventing him from filing an appeal of his September 5, 2002 Tier II Hearing. *See id.* at pp. 13-14.

---

[11] The service dates for these dispositions were from July 26, 2003, through June 24, 2004. *See* Nepveu Decl. at Exhibit "B."

On September 25, 2002, the IGRC advised Plaintiff that he needed to specify which officers denied him supplies, to which Plaintiff responded, "the blond haired klan officer."  *See id.* at p. 14.  Since Plaintiff identified one of the officers as the regular officer on duty, an investigation ensued, pursuant to which it was revealed that Correction Officer ("CO") Manning was the regular officer but was not on duty on those days and that, furthermore, the officers who were on duty did not fit the physical description that Plaintiff had supplied.  *See id.* at pp. 1-10.  Moreover, according to facility records, Defendants Dumas and Donovan were not working on Plaintiff's gallery on September 5 and 6, 2002.  Defendants' 7.1 Statement at ¶ 18; Nepveu Decl., Exhibit "I," at p. 9.

On December 23, 2002, Defendant J. Cromp issued a misbehavior report against Plaintiff due to the harassing nature of a grievance he had submitted regarding Nurse Buffman.  *See* Nepveu Decl., Exhibit "G," Jan. 6, 2003 Hearing Packet/December 23, 2002 Misbehavior Report.  Plaintiff's grievance, dated December 15, 2002,[12] described Defendant Buffman as a "despicable piece of trash" and an "ill-minded and vindictively racist character."  *See id.* at p. 11.  Although the grievance was accepted for filing and designated UST 14452-2, Plaintiff was charged with violating prison rule 107.11 (harassing employees).  *See* Nepveu Decl., Exhibit "G," at p. 9; Exhibit "J," Consolidated Inmate Grievances, at pp. 4 & 14.  Subsequently, on December 24, 2002, during sick call, Plaintiff called Defendant Buffman a "bitch," told her to "drop dead," and said, "I'll kill you."  *See* Nepveu Decl., Exhibit "H," January 6, 2003 Hearing Packet/December 24, 2002 Misbehavior Report.  Defendant Buffman issued Plaintiff a misbehavior report charging him with violating

---

[12] Plaintiff actually submitted two seemingly identical grievances against Defendant Buffman, one dated December 15, 2002, and the other dated December 16, 2002; it appears that both grievances were accepted and consolidated with another grievance regarding access to medical care.  *See* Nepveu Decl., Exhibit "J," Consolidated Inmate Grievances, at pp. 4 & 14.

prison rules 102.10 (threats), 107.10 (interference), and 107.11 (harassing employees). *See id.* at p. 10. On January 6, 2003, Lieutenant D. Quinn[13] presided as the hearing officer over two Tier II Disciplinary Hearings regarding the December 23 and 24 Misbehavior Reports. *See* Nepveu Decl., Exhibits "G" & "H." Plaintiff was found guilty of all charges and received two consecutive thirty-day sentences of keeplock confinement and corresponding loss of privileges.[14] *See* Nepveu Decl., Exhibit "G," at p. 6, Exhibit "H," at p. 7; Defendants' 7.1 Statement at ¶ 17. Both dispositions were affirmed on appeal. *See* Nepveu Decl., Exhibit "B," at p. 1; Exhibit "G," at p. 1; Exhibit "H," at p. 1.

With regard to the grievance that Plaintiff submitted regarding Defendant Buffman, Plaintiff claimed that on December 16, 2002, Defendant Buffman passed over his cell during sick call and did not provide him with his medication refills. *See* Nepveu Decl., Exhibit "J," at p. 4. This grievance was consolidated with another grievance in which Plaintiff complained that he was being denied the right to see a doctor and denied medication refills. *See id.* at pp. 3, 12, & 14. In its recommendation, the IGRC advised Plaintiff to refrain from using derogatory remarks because such remarks were counterproductive to the institution's ability to investigate. *See id.* at p. 5. The IGRC further noted that on December 24, 2002, Defendant Buffman asked Plaintiff what refills he needed, to which he responded, "I'll kill you, drop dead bitch." *See id.* Both the Superintendent and CORC affirmed the IGRC's determination on appeal. *See id.* at pp. 7, 11. CORC admonished Plaintiff for using offensive and inflammatory language and also noted that Plaintiff had been non-compliant with sick call procedures on December 10, 13, and 20, 2002, as he either remained in bed or was

---

[13] Lieutenant Quinn is not a Defendant in this action.

[14] The sentences were set to commence on March 1, 2005. *See* Nepveu Decl. at Exhibit "B."

sleeping. *See id.* at p. 11.

During the relevant time period, July 1 through December 31, 2002, the medical staff at

Upstate Correctional Facility saw Plaintiff a total of eighty-five times, an average of fourteen visits

per month. *See* Nepveu Decl., Exhibit "K," at pp. 18-48.  Furthermore, prior to receiving his

Therapeutic Diet Request Form on October 22, 2002, Plaintiff never lodged any complaints with

any medical staff regarding fish substitutions or any other dietary related problems.[15]  *See id.*

On the following dates in 2002, Plaintiff was non-compliant with sick call procedures:  July

29 (asleep during scheduled/requested sick call), August 6 (uncooperative and belligerent), August

14 (asleep during scheduled/requested sick call), August 15 (uncooperative and belligerent), August

19 (asleep during scheduled/requested sick call), August 21 (complained of jock itch but refused

exam of area), September 25 (asleep during scheduled/requested sick call), October 4 (asleep during

scheduled/requested sick call), October 5 (asleep during scheduled/requested sick call), October 6

(asleep during scheduled/requested sick call), October 9 (refused to come to cell door), October 10

(asleep during scheduled/requested sick call), October 11 (asleep during scheduled/requested sick

call), December 4 (refused to come to cell door), December 5 (refused to come to cell door),

December 7 (asleep during scheduled/requested sick call), December 9 (asleep during

scheduled/requested sick call), December 13 (asleep during scheduled/requested sick call),

December 15 (uncooperative during exam), December 18 (asleep during scheduled/requested sick

call), December 20 (asleep during scheduled/requested sick call), December 22 (asleep during

scheduled/requested sick call), December 23 (asleep during scheduled/requested sick call),

---

[15] On September 30, 2002, there is a notation in the medical record of "No Fish - No
Seafood," although it is unclear whether Plaintiff lodged an actual complaint because no further
directions follow the notation. *See* Nepveu Decl., Exhibit "K," at p. 32.

December 24 (belligerent and disrespectful – Misbehavior Report issued), and December 28 (asleep during scheduled/requested sick call).  *See* Nepveu Decl., Exhibit "K," at pp. 18-41.

### III. DISCUSSION

**A.     Summary Judgment Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . .  the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden to demonstrate through "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,'" that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c))).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by Fed. R. Civ. P. 56(e) and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992) (citation omitted).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts that the movant submitted.  Fed. R. Civ. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a

motion for summary judgment when the moving party has set out a documentary case." (citation

omitted)); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994) (citation

omitted).  To that end, "sworn statements are more than mere conclusory allegations subject to

disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and

should be treated as evidence in deciding a summary judgment motion," *Scott*, 344 F.3d at 289

(citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), and the credibility of such statements is

better left to a trier of fact, *see id.* (citing *Vital v. Interfaith Med. Ctr.*, 168 F.2d 615, 621-22 (2d Cir.

1999)).

When considering a motion for summary judgment, "the court must 'resolve [] all

ambiguities and draw [] all factual inferences in favor of the nonmoving party.'"  *Nora Beverages,*

*Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998) (quoting *Adams*, 143 F.3d at

65).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully

limited to discerning whether there are any genuine issues of material fact to be tried, not to

deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to

issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.

1994).  Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers

liberally, and . . .  interpret them to raise the strongest arguments that they suggest."  *Burgos v.*

*Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citation omitted); *accord Soto v. Walker*, 44 F.3d 169,

173 (2d Cir. 1995) (quotation and other citation omitted).  Nonetheless, mere conclusory

allegations, which the record does not support, are insufficient to defeat a motion for summary

judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (citations omitted).

**B.      Dismissal pursuant to 28 U.S.C. § 1915(g)**

Defendants ask this Court to dismiss Plaintiff's claims pursuant to 28 U.S.C. § 1915(g) "on

the grounds that [such claims are] frivolous, malicious, or fail[] to state a claim upon which relief

may be granted . . . ."  28 U.S.C. § 1915(g).

Under § 1915, individuals may seek leave of the court to pursue their claims without

prepayment of fees and costs and proceed with the litigation as a poor person or *in forma pauperis*

("IFP").  *See* 28 U.S.C. § 1915(a)(1).  The IFP statute similarly enables prisoners to apply for this

privilege, and indeed, many, if not most, incarcerated individuals bringing suits take advantage of

that opportunity.  *See* 28 U.S.C. § 1915(a)(2).  However, under this statute, a court shall dismiss a

case if it determines that such action is "(i) frivolous or malicious; (ii) fails to state a claim on which

relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such

relief."  28 U.S.C. § 1915(e)(2)(B).

Recognizing the potential for prisoner abuse and seeking to relieve the courts of congestion

caused by patently frivolous prisoner suits, Congress enacted the Prisoner Litigation Reform Act of

1996, Pub. L. 104-134, 110 Stat. 1321-66 to 1321-77 ("PLRA"), which imposes several restrictions

upon a prisoner's ability to seek redress in the courts at will.  One such mechanism is the so-called

"three strikes rule," which bars inmates from proceeding IFP after three or more previous actions, in

which the court granted the prisoner IFP status, have been dismissed as frivolous, malicious, or for

failing to state a claim, unless the prisoner is under imminent danger of serious physical injury.  *See*

28 U.S.C. § 1915(g).  Specifically, this section provides, in pertinent part, that

> [i]n no event shall a prisoner bring a civil action . . . under this section
> if the prisoner has, on 3 or more prior occasions, while incarcerated . .
> . brought an action or appeal in a court of the United States that was

> dismissed on the grounds that it is frivolous, malicious, or fails to state
> a claim upon which relief may be granted, unless the prisoner is under
> imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

In recognizing that the PLRA amendments foster legitimate governmental interests, the

Second Circuit has stated that

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates
> suffered no economic disincentive to filing lawsuits.  Indeed, the very
> nature of incarceration – prisoners have substantial free time on their
> hands, their basic living expenses are paid by the state and they are
> provided free of charge the essential resources needed to file actions and
> appeals, such as paper, pens, envelopes and legal materials – has fostered
> a "'nothing to lose and everything to gain'" environment which allows
> inmates indiscriminately to file suit at taxpayers' expense.

*Nicholas v. Tucker* 114 F.3d 17, 20 (2d Cir.1997) (citing *Anderson v. Coughlin*, 700 F.2d 37, 42 (2d

Cir. 1983) (quotation omitted)).

The Supreme Court has explained that there are two instances where a dismissal of an action

as frivolous is warranted.  *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citations omitted); *see*

*also Welch v. Galie*, 207 F.3d 130, 131 (2d Cir. 2000) (citations omitted).  First, when the "factual

contentions are clearly baseless," for example, where the allegations are the product of delusion or

fantasy, dismissal is warranted.  *Neitzke*, 490 U.S. at 327-28.  The second instance is where the

claim is "based on an indisputably meritless legal theory . . . ."  *Id.* at 327.  "A claim is based on an

'indisputably meritless legal theory' when either the claim lacks an arguable basis in law, *Benitez v.*

*Wolff*, 907 F.2d 1293, 1295 (2d Cir. 1990) (*per curium*), or a dispositive defense clearly exists on

the face of the complaint.  *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995)."  *Livingston v.*

*Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).

-14-

With these standards in mind, the Court must determine which claims, if any, are subject to dismissal pursuant to 28 U.S.C. § 1915(g).

**C.     New Claims**

As Defendants note in their Reply Memorandum of Law, Plaintiff raises new claims in his opposition to their motion.  *See, e.g.*, Dkt. No. 75, Plaintiff's Aff. in Opposition, at pp. 30-32; Dkt. No. 78, Defendants' Reply Memorandum of Law, at 3.

The Court notes that opposition papers are not the proper vehicles for adding new causes of action or for adding new defendants.  *See In re Private Capital Partners, Inc.*, 139 B.R. 120, 124-25 (Bankr. S.D.N.Y. 1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to the defendants' dispositive motion is in direct contravention of and amounted to an attempt to circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)).  If Plaintiff had wanted to supplement or amend his complaint in this case, he should have followed the proper procedural mechanisms set forth in the Federal Rules of Civil Procedure and this District's Local Rules.  Specifically, he should have made any such request by filing a motion seeking that relief.

Furthermore, "it is well established that arguments in legal memoranda may not in themselves serve to create a triable issue of material fact when unsupported by accompanying affidavits, pleadings, depositions, or stipulations."  *Greaves v. State of New York*, 958 F. Supp. 142, 144 (S.D.N.Y. 1997) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2723 at 64 (1996)) (other citation omitted).  Therefore, the Court will not construe Plaintiff's current submission as a motion to amend or supplement his

-15-

complaint; thus, any new claims that he has raised in his opposition papers are not properly before

the Court, and the Court will not consider them.

### D.   Fourteenth Amendment – Due Process

Plaintiff asserts that the following Defendants violated his Fourteenth Amendment rights to

due process:[16]

**(1)** G. Kiernert, Deputy of Programs, on July 1, 2002, subjected Chavis
to illegal SHU confinement with full deprivation of privileges without
an adequate disciplinary disposition (Complaint at attached pp. 1-2);
**(2)** A. Boucaud, Deputy of Administration, on July 1, 2002, subjected
Chavis to illegal SHU confinement with full deprivation of privileges
without an adequate disciplinary disposition and fabricated/extended
SHU confinement (Complaint at attached pp. 2-3);
**(3)** R. Girdich, Prison Superintendent,  subjected Chavis to illegal SHU
confinement with full deprivation of privileges without an adequate
disciplinary disposition (Complaint at attached p. 3);
**(4)** J. Donelli, First Deputy Superintendent, on July 1, 2002, subjected
Chavis to illegal SHU confinement with full deprivation of privileges
without an adequate disciplinary disposition (Complaint at attached p.
4);
**(5)** Ms. Daggett, Corrections Counselor, on July 1, 2002, subjected
Chavis to illegal SHU confinement with full deprivation of privileges
without an adequate disciplinary disposition and, on July 25, 2002, as a
selected Tier III Assistant, failed to complete her duty to assist Chavis at
his Hearing (Complaint at attached p. 7);
**(6)** J. Rock, CO Hearings, violated Chavis's due process rights at a Tier
III Superintendent's Hearing held on July 26, 2002 (Complaint at
attached p. 8);
**(7)** G. Canning, CO Hearings, on July 13, 2002, authored a false
misbehavior report (Complaint at attached pp. 8-9);
**(8)** L. Friot, Senior Corrections Counselor, on July 1, 2002, subjected

---

[16] Since Plaintiff failed to number all of the paragraphs in his complaint, the Court will make
reference to the attached page number.  Furthermore, in accordance with the standard of review, the
Court has liberally construed Plaintiff's claims to raise the strongest arguments they present.  Given
the nature and volume of asserted claims, the Court notes that this liberal construction inevitably
results in multiple overlapping of claims.

Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 9);

**(9)** A. Tousignant, Prison Nurse Administrator, filed a retaliatory misbehavior report on August 26, 2002 (Complaint at attached p. 10);

**(10)** Ms. Buffman, Physician's Assistant (PA), filed a retaliatory misbehavior report on December 25, 2002 (Complaint at attached p. 11);

**(11)** J. Cromp, Grievance Officer, filed a retaliatory misbehavior report on December 24, 2002 (Complaint at attached p. 13);

**(12)** R. Donaldson, Civilian Grievance Supervisor, on July 10, 2002, failed to file Chavis's grievance (Complaint at attached p. 14);

**(13)** D. Selsky, DOCS SHU Disciplinary Director, from July 1, 2002, to the date of the Complaint, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 15);

**(14)** Lucien J. LeClaire, DOCS Deputy Commissioner, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 16); and

**(15)** Richard D. Roy, Inspector General's Officer, on November 26, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached pp. 16-17).

### *1. Illegal SHU Confinement*

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[] the sentence in . . . an unexpected manner[.]" *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted). "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 37 F. Supp. 2d 162, 167 (N.D.N.Y. 1999), *vacated and remanded on other grounds by* 238 F.3d 223 (2d Cir. 2001) (citing *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996)). In *Sandin*, the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural

due process protections unless the confinement subjected the prisoner to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *see also Giano v. Selsky*, 238 F.3d at 225 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995); *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999)).  Thus, a prisoner asserting that a defendant denied him due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an "atypical and significant hardship." *Sandin*, 515 U.S. at 484.

Although the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999) (citations omitted).  Nevertheless, the Court of Appeals has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship, *see Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citation omitted); *see also Hanrahan v. Doling*, 331 F.3d 93, 97-98 (2d Cir. 2003); in comparison, segregative sentences of 125-288 days are "relatively long" and therefore necessitate "'specific articulation of . . . factual findings' before the district court could properly term the confinement atypical or insignificant . . . ." *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (internal citations omitted).

Plaintiff alleges that, on July 1, 2002, upon his admission to Upstate Correctional Facility, Defendants improperly confined him in SHU with full deprivation of privileges without a proper "disposition warranting" such confinement and deprivation.  Plaintiff seeks to hold Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire responsible for violating his due process rights by either subjecting him to, or allowing him to be subjected to,

-18-

illegal SHU confinement.  Plaintiff also claims that, on an unspecified date in August 2002,

Defendant Boucaud "fabricated a more severe SHU-Disciplinary keeplock readout sheet" thereby

extending Plaintiff's illegal SHU confinement through 2004.  *See* Complaint at attached p. 3.

According to Plaintiff's Inmate Disciplinary History, on March 7, 2000, while at Coxsackie

Correctional Facility, he received a Tier II Disciplinary Hearing resulting in a disciplinary sentence

of thirty-days keeplock confinement with loss of package, commissary, and phone privileges.  *See*

Nepveu Decl., Exhibit "B," at p. 3.  The listed service date for this sentence was set for June 27,

2002, through July 27, 2002.  First, the sentence imposed was thirty-days and, absent any allegations

to the contrary, such a brief disciplinary sentence would not implicate a liberty interest.  Notably,

Plaintiff has not alleged any circumstances in connection with that sentence that would rise to the

level of atypical and significant.  Thus, the Court concludes that, in light of all the circumstances,

Plaintiff was subjected to normal SHU conditions for thirty-days, which would not implicate a

liberty interest.

Also, the Court notes that, upon admission to Upstate Correctional Facility, Plaintiff was

confined in SHU to serve out his Coxsackie Correctional Facility keeplock sentence and that New

York Regulations specifically authorize such confinement.  *See* N.Y. Comp. Codes R. & Regs. tit.

7, § 301.6(a)(2) (stating that an inmate in Upstate Correctional Facility "may be housed in a special

housing unit . . . for confinement pursuant to a disposition of a disciplinary (Tier II) . . . hearing").

Plaintiff contends that stripping him of his privileges while he was confined in SHU was

unwarranted; however, the Coxsackie Correctional Facility Disciplinary Disposition specifically

denied him privileges for the thirty-day sentence.  *See* Nepveu Decl., Exhibit "B," at p. 3.  The Court

also notes that, in this action, Plaintiff has not challenged the propriety of that Disciplinary

Disposition and has not named any party associated with that Hearing as a Defendant in this action, although that issue is the subject of another action that Plaintiff has commenced in this District. *See Chavis v. Zodlow*, 128 Fed. Appx. 800 (2d Cir. 2005) (unpublished decision affirming in part and vacating and remanding in part); Nepveu Decl., Exhibit "O," *Chavis v. Zodlow*, 9:02-CV-637 (N.D.N.Y. Dec. 5, 2003) (Decision and Order, Hood, J., sitting by designation).

In liberally construing Plaintiff's claim based upon his arguments and the exhibits that he has submitted, the Court concludes that Plaintiff is challenging the fact that he lost certain privileges during his confinement in Upstate Correctional Facility's SHU, at least insofar as he claims he already served that portion of his Coxsackie Correctional Facility Disciplinary Sentence from March 7, 2000, through April 6, 2000. *See* Dkt. No. 75 at pp. 4-9A. The records that the parties have submitted to the Court for its review support Plaintiff's contention that he had already served his thirty-day loss of privileges sentence. *See* Nepveu Decl., Exhibit "B," at p. 3; Dkt. No. 75, at Exhibit "BB," March 7, 2000 Tier II Hearing Disposition. Although it is unclear from the record what the privileges were that Plaintiff was denied during his thirty-days in SHU, the Court is mindful that, in accordance with New York's Regulations, inmates assigned to keeplock status in SHU pursuant to § 301.6 are subject to the property, visiting, package, commissary, telephone, and correspondence limitations set forth in §§ 302.2(a) - (j). *See* N.Y. Codes R. & Regs. tit. 7, §§ 301.6(c) - (h) & 302.2(a) - (j). Plaintiff has not raised any claim that any deprivations that he suffered were contrary to the above regulations and, in any event, because Plaintiff's allegations amount to normal SHU conditions, the Court finds that no liberty interest is implicated.

With regard to Plaintiff's allegation that Defendant Boucaud fabricated a more severe SHU-Disciplinary keeplock readout sheet, Defendant Boucaud avers, in a sworn Declaration, that he did

not alter Plaintiff's records; and Plaintiff has not presented any proof demonstrating otherwise.  In his complaint, Plaintiff states that Defendant Boucaud falsified the document sometime in August; however, in his opposition papers, which are replete with his incoherent ramblings, Plaintiff argues that Defendants improperly denied him privileges.  *Compare* Complaint at attached p. 3 *with* Dkt. No. 75 at pp. 4-9A.  This discrepancy is inexplicable; there is no date in August that this Court can discern on which Defendant Boucaud would have had cause to alter Plaintiff's confinement in SHU because, by that time, Plaintiff was serving the twelve-month SHU sentence that Defendant Rock imposed at the July 26, 2002 Tier III Superintendent's Hearing.  *See* Nepveu Decl., Exhibit "B," at p. 1; *see infra* Part III.D.3.

Lastly, Plaintiff alleges that Defendant Roy violated his due process rights when he ignored a letter that Plaintiff wrote to him regarding, among other things, his "illegal" SHU confinement.  It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *see McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (citations omitted), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978)).  The fact that Plaintiff may have written a letter to Defendant Roy does not automatically render him responsible for any constitutional violations.  *See Thomas v. Coombe*, No. 95 Civ. 10342, 1998 WL 391143, *6 (S.D.N.Y. July 13, 1998) (citations omitted) (ignoring letter is insufficient for personal involvement); *Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) (holding that "the wrong must have been . . . capable of mitigation at the time the supervisory official was apprised thereof" (citation omitted)); *Woods v. Goord*, No. 97 CIV. 5143, 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998)

(holding that receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care).  Thus, Plaintiff cannot hold Defendant Roy liable for the alleged violation of his constitutional rights simply because he either responded or, conversely, failed to respond, to a complaint.  *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997).  In any event, because the Court has concluded that no violations of Plaintiff's constitutional rights occurred, there is no need for the Court to consider the extent, if any, of Defendant Roy's involvement.  The Court further finds that Plaintiff's general allegations against these nine Defendants arising from his July 1, 2002 confinement in SHU, regardless of the actual role or power that these Defendants possessed, are patently frivolous and even borderline malicious.  Accordingly, the Court **dismisses** Plaintiff's due process claims against Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire based upon Plaintiff's confinement to SHU on July 1, 2002, pursuant to 28 U.S.C. § 1915(g).


### 2. Retaliatory Misbehavior Reports

Plaintiff alleges that Defendants Tousignant, Cromp, and Buffman filed retaliatory misbehavior reports against him on August 26, December 24, and December 25, 2002, respectively. It is not clear whether Plaintiff challenges the veracity of these reports.  However, to the extent that he is claiming that these reports were false, it is well-settled that prisoners have no constitutional right to be free from being falsely accused.  *See Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest").  Rather, the Constitution guarantees that such inmates will not be "deprived of a protected

liberty interest without due process of law." *Id*.  Thus, as long as prison officials provide the inmate with procedural due process requirements, *i.e.*, a hearing and an opportunity to be heard, "'the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983.'"  *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (quotation omitted); *see also Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974).

However, before the Court addresses such issues, it must determine whether a liberty interest is implicated.  The misbehavior reports at issue resulted in three sentences of thirty-days keeplock and corresponding losses of privileges.  *See* Nepveu Decl., Exhibit "B," at p. 1.  Even if this Court were to construe the three sentences in the aggregate, the ninety days total that Plaintiff was confined in SHU would not, standing alone, implicate a liberty interest.  Moreover, because at the time that Plaintiff filed his complaint he had not yet served these sentences, the Court is unable to determine whether the actual conditions of confinement in SHU were atypical or significant. Accordingly, because no liberty interest is implicated, Plaintiff cannot assert due process violations against Defendants Tousignant, Buffman, and Cromp and, therefore, the Court **grants** Defendants' motion for summary judgment with regard to these claims.

Notably, however, there are substantive due process rights, rather than procedural, which cannot be obstructed "'even if undertaken with a full panoply of procedural protections,'" such as the right of access to courts or to be free from retaliation for exercising a constitutional right.  *Franco*, 854 F.2d at 589 (citation omitted); *see id.* at 590 ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, . . . that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights." (internal citations omitted)).  Thus, if a prisoner alleges that the defendants

-23-

filed false disciplinary reports  against him in retaliation for exercising a valid constitutional right,

his claim may survive a dispositive motion if he properly alleges that the defendants violated his

substantive due process rights.  *See id.* ("If [the plaintiff] can prove his allegation that he was

subjected to false disciplinary charges and subsequent punishment for his [exercise of a

constitutional right], he is entitled to relief under section 1983.").

Plaintiff does assert that the three misbehavior reports that Defendants Tousignant, Buffman,

and Cromp filed against him were retaliatory in nature.  Thus, the Court will address these claims,

together with Plaintiff's claim against Defendant Donaldson for willful failure to file Plaintiff's

grievances, below in the context of the standards applicable to substantive due process claims.  *See*

*infra* Parts III.E-F.

### 3. Disciplinary Hearings

Finally, Plaintiff claims that Defendants Rock, Daggett, and Canning violated his due

process rights in connection with the July 26, 2002 Tier III Superintendent's Hearing.  As explained

below, since Defendant Rock, as Hearing Officer, recommended a loss of good time credits and that

disposition was affirmed on appeal, Plaintiff's due process claims are barred.

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a § 1983 action

seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate

a criminal conviction or sentence unless "the conviction or sentence has been reversed on direct

appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such

determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28

U.S.C. § 2254."  *Id.* at 486-87.  The Supreme Court later extended its *Heck* ruling to situations in

which inmates challenge disciplinary proceedings that resulted in a loss of good time credits

wherein the validity of a disciplinary or administrative sanction would affect the length of the

plaintiff's confinement.  *See Edwards v. Balisok*, 520 U.S. 641 (1997).  This rule does not impose an

exhaustion requirement upon a § 1983 plaintiff, but rather, "den[ies] the existence of a cause of

action."  *Heck*, 512 U.S. at 489.

In the present case, any resolution of Plaintiff's due process claims would ultimately call into

question the validity of his disciplinary conviction.  Such claims are, therefore, not cognizable under

§ 1983 absent a showing that this sentence has been overturned or invalidated.  Plaintiff has not

made such a showing and, therefore, the Court **grants** Defendants' motion for summary judgment

and **dismisses without prejudice** Plaintiff's due process claims against Defendants Rock, Daggett,

and Canning.[17]

## E.      First and Fourteenth Amendment – Access to Courts

Plaintiff claims that the following Defendants violated his First and Fourteenth Amendment

right to petition the courts for redress:

> **(1)** G. Kienert, on September 5, 6, and 30, 2002, as well as October 25,
> 2002, ordered SHU officers to confiscate Chavis's legal mail and deny
> access to the law library (Complaint at attached pp. 1-2);
> **(2)** R. Girdich, on September 1, 6, and 30, 2002, as well as October 25,
> 2002, ordered SHU officers to confiscate outgoing legal mail (Complaint
> at attached p. 3);
> **(3)** B. Dumas, CO SHU, on September 5, 6, and 30, 2002, as well as

---

[17] The Court dismisses Plaintiff's claims without prejudice because such claims would accrue
in the event that his sentence is overturned.  *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999)
(holding that "disposition of [a] case on *Heck* grounds . . . warrants only dismissal *without*
prejudice, because the suit may be reinstituted" in the event the plaintiff's conviction is overturned
(citations omitted)).

October 25, 2002, confiscated Chavis's legal mail and denied replacement envelopes, and, on September 8, 2002, as well as unspecified dates in November and December 2002, failed to send outgoing legal mail (Complaint at attached p. 5);

**(4)** M. White, CO SHU, on unspecified dates in August, September, and October, 2002, ignored Chavis's request slips and denied access to the law library (Complaint at attached p. 5);

**(5)** A. Donovan, CO SHU, on September 5 and 6, 2002, confiscated Chavis's outgoing legal mail, wherein Chavis was unable to "redo" and mail his administrative appeal and further aided Defendants Kienert, Girdich, and Dumas, presumably, in denying access to the courts.  (Complaint at attached p. 6);

**(6)** G. Canning, on July 12, 2002, denied Chavis access to his legal materials despite being directed otherwise (Complaint at attached p. 9);

**(7)** R. Donaldson, on July 10, 2002, and continuing to the date of the Complaint, failed to redress Chavis's grievances of legal mail confiscation against Defendants Donovan, Dumas, Girdich, and Kienert (Complaint at attached p. 14); and

**(8)** Richard D. Roy, on November 26, 2002, ignored the illegal confiscation and censoring of Chavis's legal mail by Defendants Kienert, Girdich, Dumas, Donovan, and Donaldson (Complaint at attached pp. 16-17).

Interference with legal mail implicates an inmate's First and Fourteenth Amendment rights to access to the courts and free speech.  *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).  The Second Circuit has stated that in order to state a claim for denial of access to the courts via interference with legal mail, the plaintiff must show that the defendant caused actual injury, *i.e.*, the defendant "'took or was responsible for actions that "hindered [a plaintiff's] efforts to pursue a legal claim."'"  *Id*. (quotation omitted); *see also Cancel v. Goord*, No. 00 CIV 2042, 2001 WL 303713, *4 (S.D.N.Y. Mar. 29, 2001) (holding that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim" (citation omitted)).

-26-

Additionally, a prisoner's First Amendment right is implicated when the defendants hinder the "free flow of incoming and outgoing mail . . . ." *Davis*, 320 F.3d at 351 (citations omitted). "Restrictions on prisoners' mail are justified only if they 'further[] one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id*. (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).  When balancing these competing interests, "courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citations omitted).  Moreover, when asserting a First Amendment violation resulting from interference with mail, the prisoner must show that the prison officials "**regularly and unjustifiably** interfered with the incoming legal mail rather than merely showing an isolated incident." *Cancel v. Goord*, 00 CIV 2042, 2001 WL 303713, *6 (emphasis added) (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)); *see also Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975) (isolated incident of tampering is insufficient to state a constitutional violation).  The Court notes, however, that the Second Circuit has held that as few as two incidents of mail tampering may be sufficiently actionable "(1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citation omitted).  Thus, in cases where the incidents are few and a violation is not patent, the plaintiff should specifically allege invidious intent or actual harm.  *See id.* (citing cases).  Furthermore, mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y

1995) (citations omitted); *see also Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) (citations omitted).

Plaintiff fails to state a claim for denial of access to the courts.  First, Plaintiff does not claim that Defendants' alleged confiscation of his outgoing mail, denial of replacement envelopes, denial of access to the law library, and/or denial of access to his legal papers caused him any actual harm. Moreover, the only concrete harm he alleges is the confiscation of his appeal from the September 5, 2002 Hearing disposition.  In this regard, Plaintiff claims that, on September 5 and 6, 2002, ostensibly on Defendants Kienert's and Girdich's orders, Defendants Dumas and Donovan confiscated Plaintiff's outgoing mail and refused to supply Plaintiff with replacement envelopes. Plaintiff further alleges that, on unspecified dates in August, September, and October, Defendant White ignored his request slips and denied him access to the law library.  However, according to the Declarations that Defendants have submitted to the Court, facility records indicate that Defendants Dumas and Donovan were not assigned to Plaintiff's gallery on those days; rather, two other correction officers, whom Plaintiff has not named as Defendants herein, were on duty.  *See* Dkt. No. 72, B. Dumas Decl., at ¶ 4; A. Donovan Decl., at ¶ 4.  Furthermore, Defendants Dumas and Donovan avow that they "never confiscated, kept, improperly returned, or otherwise improperly interfered with Mr. Chavis's outgoing legal mail[ ]" and Defendant White affirms he never ignored Plaintiff's request slips.  *See* Dkt. No. 72, Dumas Decl., at ¶ 5; Donovan Decl., at ¶ 5; M. White Decl., at ¶ 4.  Defendants Kienert and Girdich also aver that they "never ordered anyone to confiscate, keep, or interfere with Mr. Chavis's outgoing legal or internal mail" within the parameters of DOCS policy.  *See* Dkt. No. 72, G. Kienert Decl., at ¶ 3; R. Girdich Decl., at ¶ 3. Similarly, with regard to Defendant Donaldson's alleged interference with Plaintiff's grievances,

Defendant Donaldson avows that he never concealed nor failed to docket any grievance that

Plaintiff filed.  *See* Dkt. No. 72, Donaldson Decl., at ¶ 3.

Plaintiff further claims that, on July 12, 2002, Defendant Canning denied him access to his

legal materials.  Defendant Canning specifically controverts this allegation in a sworn Declaration,

in which he further explains that he wrote a misbehavior report on July 12, 2002, due to Plaintiff's

admission that he had written a harassing letter to an AAG.  *See* Dkt. No. 72, G. Canning Decl., at

¶¶ 3-5; *see also* Nepveu Decl., Exhibit "C," at pp. 6-8 (AAG letter, dated July 9, 2002, & attached

Chavis letter, dated July 3, 2002).

Plaintiff's final claim that Defendants denied him access to the courts is based upon his

allegation that Defendant Roy ignored his letter.  The Court **dismisses** this claim for the reasons

stated above regarding personal involvement.  *See supra* Part III.D.1.  In light of the fact that many

of Plaintiff's claims of denial of access to the courts are not only conclusory in nature but are also

asserted against individuals who Plaintiff clearly had notice through the grievance process were not

even present on the dates in question, the Court finds that such claims are frivolous.  Therefore, the

Court **dismisses** Plaintiff's access-to-the-courts claims against Defendants Kienert, Girdich, Dumas,

White, Donovan, Canning, Donaldson and Roy pursuant to 28 U.S.C. § 1915(g).


**F.      First and Fourteenth Amendment – Retaliation**

Plaintiff asserts that the following Defendants took retaliatory actions against him:

> **(1)** A. Tousignant issued a retaliatory misbehavior report after Chavis
> filed a grievance against staff on August 28, 2002 (Complaint at
> attached p. 10);
> **(2)** R. Girdich, on October 30, 2002, fabricated a state charge against
> Chavis in retaliation for a grievance he had filed (Complaint at

attached p. 4);

**(3)** G. Canning, on July 13, 2002, filed a retaliatory misbehavior report regarding threats to outside legal sources (Complaint at attached p. 9);

**(4)** Ms. Buffman, on December 25, 2002, filed a retaliatory misbehavior report after Chavis filed two grievances against her, dated December 15 and 16, 2002 (Complaint at attached p. 11); and

**(5)** J. Cromp, on December 24, 2002, filed a retaliatory misbehavior report for a grievance Chavis filed against Nurse Buffman on December 16, 2002 (Complaint at attached p. 13).

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or to be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *See Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir. 1988)).  To state a First Amendment claim for retaliation, an inmate must demonstrate (1) that he was engaged in constitutionally protected activity, (2) that the defendant took adverse action against him, and (3) that there was a causal connection between the protected speech and the adverse action in that the alleged adverse action was substantially motivated by the protected activity. *See Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (quotation omitted); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quotation omitted).

To satisfy the second prong, a prisoner must present evidence to support his claim that the defendants acted with an improper motive.  Such evidence includes (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995).  A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus

obviating the need for direct evidence. *See Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003)

(holding that the plaintiff met his burden to show retaliatory motive by presenting circumstantial

evidence relating to, among other things, the temporal proximity of the allegedly false misbehavior

reports and the subsequent reversal of the disciplinary charges on appeal as unfounded (citation

omitted)). "'Only retaliatory conduct that would deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of

retaliation.'" *Davis v. Goord*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d at 493) (other

citation omitted). "'Otherwise the retaliatory act is simply *de minimis* and therefore outside the

ambit of constitutional protection.'" Id. (quotation omitted). Furthermore, in satisfying the causal

connection requirement, also referred to as temporal proximity, "the allegations must be "'sufficient

to support the inference "that the speech played a substantial part" in the adverse action.'" *Id*. at 492

(quotation omitted).

The plaintiff bears the initial burden to show that the defendants' actions were improperly

motivated. In situations in which the defendants' actions are the result of both retaliatory and

legitimate reasons, the burden shifts to the defendants to show that they would have taken the same

action absent the retaliatory motive. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)

(citation omitted); *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (citations omitted); *see also

Gayle*, 313 F.3d at 682 (holding that the defendant may successfully meet this burden of

justification with regard to a particular punishment by demonstrating that the plaintiff "'committed

the most serious, if not all, of the prohibited conduct charged in the misbehavior report'" (quotation

and other citation )). Moreover, the Second Circuit has noted that retaliation claims are prone to

abuse and that, therefore, courts should examine such claims "with skepticism and particular care."

*Colon*, 58 F.3d at 872 (citation omitted); *Dawes*, 239 F.3d at 491 (holding that "virtually any

adverse action taken against a prisoner by a prison official – even those otherwise not rising to the

level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory

act." (citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quotation

omitted).

Plaintiff claims that Defendants wrote four misbehavior reports against him, in which they

charged him with harassment and/or threats, in retaliation for his exercising his constitutional rights.

Defendants Canning, Tousignant, Cromp, and Buffman authored these four misbehavior reports on

July 12, 2002, August 26, 2002, December 23, 2002, and December 24, 2002, respectively.  As

explained more fully below, because Plaintiff has failed to meet his burden to show improper

motives and because the record demonstrates that Defendants issued all of these reports for valid

reasons, the Court concludes that Plaintiff's retaliation claims against these Defendants must fail.

Plaintiff asserts that on July 12, 2002, Defendant Canning wrote a retaliatory misbehavior

report against him.  The subject of this misbehavior report was the threatening letter, marked as

"legal mail," that Plaintiff had written while he was confined in SHU to an AAG.  In a subsequent

interview, Plaintiff **admitted** to Defendant Canning that he wrote that letter, prompting Defendant

Canning to charge him with violating prison rules 102.10 (threats in writing), 107.11 (inmates shall

not harass any person), and 180.11 (correspondence procedures).  *See* Nepveu Decl., Exhibit "C," at

p. 16.  Although it is dubious, given the nature of the letter, whether the activity in which Plaintiff

engaged could be classified as protected activity, were this Court to liberally construe this issue in

Plaintiff's favor, he would still fail to meet his burden with respect to his retaliation claim against

Defendant Canning because he failed to present even a shred of evidence of improper motive on

Defendant Canning's part.  Moreover, Defendant Canning has, under oath, denied any improper motive.  *See* Canning Decl. at ¶¶ 5-6.  Finally, the Court's review of the letter leads to the inescapable conclusion that the tone and content of the letter is threatening and harassing; and, thus, the Court concludes that Defendant Canning clearly had a proper motive to write the misbehavior report.

Next, Plaintiff complains about a misbehavior report, dated August 26, 2002, that Defendant Tousignant authored.  The subject of this misbehavior report is the letter that Plaintiff wrote to Defendant Tousignant regarding Nurse Buffman, in which Plaintiff referred to Nurse Buffman as an "ill-minded lesbian dyke of a deeply rooted perverted mentality" and a "KKK staff member [who] hand masturbates SHU-inmates through the access door."  *See* Nepveu Decl., Exhibit "E," at p. 6.  Again, if the Court liberally construes this claim to find that, in submitting a grievance to a supervisor, Plaintiff may have been engaged in protected activity, he still fails to present any evidence of an improper motive.  Under oath, Defendant Tousignant denied any acrimonious motive in writing the report.  *See* Dkt. No. 72, Tousignant Decl., at ¶¶ 16-17.  Moreover, even if Plaintiff had shown that Defendant Tousignant acted with an improper motive, his claim would still fail because, in light of the obvious harassing and threatening tone of Plaintiff's letter, Defendant Tousignant appropriately issued a misbehavior report against him.

Plaintiff also challenges the misbehavior reports, dated December 23 and 24, 2002, that Defendants Cromp and Buffman authored, respectively.  Defendant Cromp's December 23, 2002 misbehavior report, much like those that the Court has already addressed, arose out of a threatening and harassing grievance that Plaintiff wrote regarding Nurse Buffman, in which he called Nurse Buffman a "despicable piece of trash" and an "unprofessional, ill-minded, and vindictive freak."  *See*

Nepveu Decl., Exhibit "G," at pp. 11-12.  Although filing an institutional grievance is clearly

protected activity, Plaintiff, yet again, fails to allege that Defendant Cromp possessed any improper

motive in authoring the report.  Moreover, Defendant Cromp, under oath, has denied any improper

motive.  *See* Dkt. No. 72, Cromp Decl., at ¶¶ 5-7.  Furthermore, Plaintiff's grievance was docketed

and addressed at all levels; thus, Plaintiff was not in any way constrained nor encumbered in having

this and other grievances addressed.  Lastly, with regard to Defendant Buffman's December 24,

2002 misbehavior report, on that date, Plaintiff told Defendant Buffman, during sick call, that he

needed prescriptions refilled.  When she asked him which refills he needed, Plaintiff refused to

answer and became disrespectful and belligerent, called Defendant Buffman a "bitch," told her to

"drop dead," and threatened to kill her.  *See* Nepveu Decl., Exhibit "H," at p. 10; Buffman Decl. at

¶ 12.  Under these circumstances, Defendant Buffman was clearly justified in filing this misbehavior

report against Plaintiff.  *See* Dkt. No. 72, Buffman Decl., at ¶¶ 12-13.

Plaintiff's final retaliation claim is against Defendant Girdich for allegedly fabricating a state

charge on October 30, 2002.  In his Declaration, Defendant Girdich denies bringing any state

criminal charges against Plaintiff.  *See* Dkt. No. 72, Girdich Decl., at ¶ 10.  Since Plaintiff fails to

expound on this claim, the Court finds that it is clearly without merit.

In light of the fact that at least three of the misbehavior reports were in response to remarks

that Plaintiff made in writing with his signature affixed to such writings, the Court finds that these

claims of retaliation are entirely without merit and bordering upon harassment.  Furthermore,

Plaintiff's retaliation claim against Defendant Girdich is completely unsubstantiated because

Defendant Girdich never filed any state charges against Plaintiff.  Accordingly, the Court concludes

that Plaintiff has failed to state retaliation claims against Defendants Canning, Tousignant, Cromp,

Buffman and Girdich, and, therefore, **grants** Defendants' motion for summary judgment with respect to these claims.  Alternatively, the Court **dismisses** Plaintiff's retaliation claims against Defendants Canning, Tousignant, Cromp, and Girdich as frivolous pursuant to 28 U.S.C. § 1915(g).

**G.    Eighth Amendment**

Plaintiff alleges that Defendants committed numerous infractions that violated his Eighth Amendment right to be free from cruel and unusual punishment.  The crux of his claims centers around the conditions of his confinement in SHU as well as the denial of medical care.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *See Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (citation omitted).  In this respect, the Eighth Amendment requires that prison officials provide prisoners with humane conditions of confinement including "'adequate . . . medical care[.]'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation and other citation omitted).  To prove a violation of the Eighth Amendment, an inmate must show (1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.'"  *Trammell*, 338 F.3d at 161 (citation omitted).  Moreover, the Eighth Amendment prohibits punishments that are "grossly disproportionate to the severity of the crime," including unnecessary and wanton inflictions of pain which are "'totally without penological justification.'"  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quotation and other citations omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citations omitted).

-35-

### 1. Prison Conditions

With regard to his complaints about prison conditions, Plaintiff asserts that the following

Defendants subjected him to inhumane conditions in violation of the Eighth Amendment:

> **(1)** G. Kienert, on July 1, 2002, exhibited deliberate indifference when
> he subjected Chavis to illegal SHU confinement, and, purportedly on
> September 5, 6, and 30, 2002, as well as October 25, 2002, Kienert
> ordered SHU officers to deny Chavis access to hygenic items such as
> soap, shampoo, and nail clippers, and also directed the officers to
> tamper with his food trays, including spitting on the food (Complaint
> at attached pp. 1-2);
> **(2)** A. Boucaud, on August 2, 2002, exhibited deliberate indifference
> when he fabricated and wrongfully extended Chavis's confinement in
> SHU (Complaint at attached pp. 2-3);
> **(3)** M. White, on unspecified dates in August, September, and
> October 2002, exhibited deliberate indifference when he spat in
> Chavis's food and denied him access to various hygienic supplies
> resulting in Chavis's inability to shower for two months (Complaint at
> attached pp. 5-6);
> **(4)** Ms. Daggett, on July 1, 2002, exhibited deliberate indifference by
> subjecting Chavis to illegal SHU confinement (Complaint at attached
> p. 7);
> **(5)** J. Rock, on July 26, 2002, exhibited deliberate indifference when
> he commenced a Tier III Hearing in Chavis's absence and subjected
> Chavis to further illegal SHU confinement (Complaint at attached p.
> 8);
> **(6)** G. Canning, on July 13, 2002, authored a false misbehavior report
> which led to further illegal SHU confinement (Complaint at attached
> p. 8);
> **(7)** L. Friot, on July 1, 2002, exhibited deliberate indifference by
> continuing and subjecting Chavis to illegal SHU confinement
> (Complaint at attached p. 9); and
> **(8)** Lucien J. LeClaire, on July 1, 2002, allowed Chavis to be
> subjected to illegal SHU confinement (Complaint at attached p. 16).

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,'

. . . but neither does it permit inhumane ones . . . ." *Farmer,* 511 U.S. at 832 (internal quotation

omitted).  The prisoner "must show 'extreme deprivations', '[b]ecause routine discomfort is "part of

the penalty that criminal offenders pay for their offenses against society . . . ." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (quotation and other citation omitted); *see also Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999( (holding that, [b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a "conditions-of-confinement" claim.'" (quotation omitted)).

To establish an Eighth Amendment claim based upon his conditions of confinement, an inmate must allege that the conditions of his confinement have violated "'contemporary standards of decency.'" *Davidson v. Murray*, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (quoting *Phelps v. Kapnolas*, 308 F.3d 180,185 (2d Cir. 2002)).  "To satisfy the objective element, the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measure of life's necessities.'" *Davidson*, 371 F. Supp. 2d at 370 (quotation and other citation omitted).  "[T]he objective element is satisfied 'only when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.'" *Id.* (quotation omitted).  Allegations of "overall conditions" will not rise to the level of cruel and unusual punishment without the existence of a "specific deprivation of a single human need . . . ." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991).  As to the subjective element, the requisite scienter is that of deliberate indifference to the inmate's health or safety.  *See Farmer*, 511 U.S. at 834.

Initially, the Court notes that Plaintiff's "deliberate indifference" claims against Defendants Kienert, Daggett, Friot, and LeClaire, stemming from his confinement in SHU on July 1, 2002, are without merit as the sole basis for these claims is the alleged illegality of his confinement to SHU on

that date, an issue this Court has already resolved in Defendants' favor.  Likewise, the Court has already addressed Plaintiff's claims against Defendants Boucaud (August 2, 2002 extension of SHU confinement), Rock (July 26, 2002 improper hearing subjecting Chavis to illegal SHU confinement), and Canning (July 12, 2002 misbehavior report leading to illegal SHU confinement) and concluded that they lack merit.  Thus, Plaintiff's only remaining conditions-of-confinement those based upon his allegations against Defendants Kienert for allegedly ordering SHU officers to deny him hygienic materials and tamper with his food and against Defendant White for carrying out those orders.

The Eighth Amendment does require that prison officials serve prisoners "'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"  *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)); *see also Wilson*, 501 U.S. at 303 (prisoners are guaranteed a nutritionally adequate diet).  Moreover, although courts in this Circuit have found claims of unsanitary, spoiled, or contaminated foods to be sufficient to sustain an Eighth Amendment claim, *see Robles*, 725 F.2d at 15-16 (citing cases), Plaintiff's allegations that Defendants spit in his food and "violat[ed] [his] bread by making holes in it" are wholly conclusory and unsubstantiated.

Plaintiff also claims the Defendants denied him various toiletry/hygienic items and that these denials "prohibited" him from showering "for a near 'two' month time period."  *See* Complaint at attached p. 6.  The Court does not understand how the deprivation of such items would lead to the deprivation of showers; what is more probable, however, is that Defendants provided Plaintiff with opportunities to shower, but without shampoo and soap.  Defendant White's Declaration adequately

supports this possibility; he explains that the SHU showers occur in the inmate's cell and a single switch turns on the water in an entire side for twenty-minutes and that it is not possible to control the shower in a single cell. *See* White Decl. at ¶ 9. Given these facts, which Plaintiff does not dispute, the Court concludes that it is incredulous for Plaintiff to assert that Defendant White, on Defendant Kienert's orders, denied him access to showers for a two-month period.

Further, Plaintiff has failed to show that the alleged denial of toiletries rose to the level of deliberate indifference to his health or safety. Courts, including the Second Circuit, have generally held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell*, 338 F.3d at 165 (holding that "[d]eprivation of other toiletries for approximately two weeks – while perhaps uncomfortable – does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.'" (quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970)). Accordingly, the Court **dismisses** all of Plaintiff's Eighth Amendment claims regarding the conditions of his confinement as frivolous under 28 U.S.C. § 1915(g).

### 2. Medical-indifference Claims

Plaintiff asserts that the following Defendants denied him access to medical care in violation of the Eighth Amendment:

> **(1)** A. Tousignant, on July 28, 2002, denied proper medical care and further denied twenty-six (26) "medical food trays" to Chavis that were required due to his seafood allergies, resulting in loss of twenty (20) pounds over a three-month period (Complaint at attached pp. 10-11);
> **(2)** Ms. Buffman, on July 10, 2002, denied Chavis emergency treatment

and denied access to a doctor for treatment of serious allergic reaction and worked in concert with Tousignant in denying Chavis his medical food trays (Complaint at attached pp. 10-11);

**(3)** P. Johnston, PA, on December 17, 2002, denied Chavis access to medical care for severe to mild medical conditions and failed to refill prescriptions. Also, on December 24 and 27, 2002, Johnston failed to provide medical care to Chavis during allergic reactions (Complaint at attached p. 12);

**(4)** J. Cromp, on December 24, 2002, exhibited deliberate indifference when he concealed a valid grievance regarding Nurse Buffman's medical violations and thus sanctioned the medical violations (Complaint at attached p. 13);

**(5)** L.N. Wright, Chief Medical Officer, on unspecified dates in August and December 2002, repeatedly ignored Chavis's letters regarding medical complaints (Complaint at attached p. 13);

**(6)** R. Donaldson, from July 10, 2002, to the date of the Complaint, failed to file Chavis's grievances against medical staff regarding medical care thus allowing the violations to continue (Complaint at attached p. 14);

**(7)** M. Yaddow, CO SHU, on December 27, 2002, removed Chavis's request slip for medical care thus preventing access to adequate care (Complaint at attached p.15); and

**(8)** Richard D. Roy, on March 26, 2002, ignored Chavis's letters regarding medical care (Complaint at attached pp. 16-17).

To state an Eighth Amendment claim based upon the denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) the defendants' deliberate indifference to that serious medical need. *See Farmer*, 511 U.S. at 834-35 (citations omitted); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted). With respect to the "deliberate indifference" prong of this claim, "the plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'"" *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting [*Estelle v. Gamble*, 429 U.S. 97,] 102, 105-06, 97 S. Ct. at 290, 291-92).

The first prong is an objective standard and considers whether the medical condition is

sufficiently serious.  The Second Circuit has stated that a medical need is serious if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quotation omitted).  Among the relevant factors that a court should consider in making this determination are "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Id.* (quotation and other citation omitted).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson*, 501 U.S. at 301-03; *Hathaway*, 37 F.3d at 66.  A plaintiff also must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm.  *See Farmer*, 511 U.S. at 836.  This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citation omitted).  Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (quotation omitted).

With respect to his claims against Defendants Wright and Roy, the Court finds that Plaintiff has failed to allege any personal involvement of these Defendants in any constitutional violation and therefore **dismisses** all Eighth Amendment claims, in addition to the other claims that the Court has

dismissed, against these Defendants for the same reasons that the Court dismissed the due process claims against Defendant Roy.  *See supra* Part III.D.1.  In addition, with respect to Plaintiff's claim against Defendant Cromp, the Court finds that the record clearly belies Plaintiff's claim that Defendant Cromp concealed his grievance against Nurse Buffman because all three administrative levels addressed that particular grievance.  The same is true of Plaintiff's allegations against Defendant Donaldson for concealing grievances that Plaintiff filed against medical staff, because, as the record indicates, Plaintiff did file such grievances, which were similarly addressed at all administrative levels.  Lastly, with respect to his claim against Defendant Yaddow, Plaintiff asserts that Defendant Yaddow denied him access to medical care by removing his request slip on December 27, 2002.  However, according to facility records, on that date, Defendant Yaddow worked from 3 p.m. to 11 p.m. in the C Gallery of Building 9, while Plaintiff was housed in the B Gallery of Building 9.  *See* Dkt. No. 72, Yaddow Decl., at ¶¶ 3-4.  Obviously, Defendant Yaddow would have had no occasion, nor arguably any opportunity, to conceal or remove any request slip if he was not even in the vicinity of Plaintiff on that date.  Thus, the Court **dismisses** Plaintiff's Eighth Amendment medical-indifference claims against Defendants Cromp, Donaldson, and Yaddow as frivolous pursuant to 28 U.S.C. § 1915(g).

Plaintiff's remaining Eighth Amendment medical-indifference claims are against Defendants Tousignant, Buffman, and Johnston.  With regard to these claims, Plaintiff alleges that he suffered from "mild" or "mild to near serious" hive attacks and scalp bleeding.  *See* Complaint at attached pp. 10-12.  Such conditions are not sufficiently serious that they would produce death, degradation, or extreme pain.  *See Chance*, 143 F.3d at 702.  Therefore, with respect to these allegations, the Court finds that Plaintiff cannot satisfy the objective prong of his medical-indifference claim.  Moreover,

-42-

even if this Court were to find that Plaintiff's condition was sufficiently serious, because food allergies can in some cases become life-threatening, his claim would still fail because he has not come forward with any evidence that any of the above-named Defendants acted with deliberate indifference to these serious needs.  In fact, Plaintiff's health record reveals that medical staff frequently saw him and that he often would request medical services and yet fail to appear because he was asleep at the designated time.  *See* Nepveu Decl., Exhibit "K," at p. 19; Buffman Decl., at ¶ 10; *see also supra* Part II (noting that medical staff saw Plaintiff an average of fourteen times per month and further listing the multiple instances when Plaintiff was asleep during the requested/scheduled sick call times and/or was belligerent and uncooperative with medical staff). The health record also contradicts Plaintiff's contention that Defendant Johnston failed to refill his prescriptions.  *See* Nepveu Decl., Exhibit "K," at p. 20.  In light of the fact that Plaintiff has failed to allege a sufficiently serious medical condition, coupled with the fact that the record clearly indicates that Defendants did not act with a sufficiently culpable state of mind, the Court grants Defendants' motion for summary judgment with regard to all of Plaintiff's Eighth Amendment medical-indifference claims.

Plaintiff's remaining Eighth Amendment claims relate to his allegations that Defendants Tousignant and Buffman denied, or perhaps delayed, his medical food trays.  Essentially, Plaintiff complains that he did not receive a Therapeutic Diet Request Form ordering a no-fish diet.  In certain circumstances, the denial of a medically-prescribed diet may constitute an Eighth Amendment violation.  *See Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (citations omitted).  *But cf. Ramsey v. Coughlin*, 1 F. Supp. 2d 198, 205 (W.D.N.Y. 1998) (holding that, under the particular circumstances of that case, the inmate was not constitutionally entitled to

vegetarian diet).  Furthermore, a delay in medical treatment does not necessarily invoke the Eighth

Amendment.  "Although a delay in providing necessary medical care may in some cases constitute

deliberate indifference, . . . such a classification [is reserved] for cases in which, for example,

officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-

degenerating' condition for three days; or delayed major surgery for over two years."  *Freeman v.*

*Strack*, 2000 WL 1459782, *6 (S.D.N.Y. Sep. 29, 2000) (citations omitted).  Only when the official

"knows of and disregards an excessive risk to inmate health or safety" will a court find that that

official was deliberately indifferent.  *Hathaway*, 99 F.3d at 553.  In this case, the record indicates

that neither Defendant Tousignant nor Defendant Buffman was responsible for filling out such a

form or that either of them was even aware of the delay, if such occurred.  *See* Tousignant Decl. at

¶¶ 9-10; Buffman Decl., at ¶¶ 16-18; Nepveu Decl., Exhibit "K," at pp. 48-53; Exhibit "M," July 28,

2002 Memo from Tousignant.  Even more telling is that fact that, from July 1, 2002, the date on

which Plaintiff was transferred to Upstate Correctional Facility, through October 22, 2002, the date

on which the Therapeutic Diet Form was executed, the medical staff saw Plaintiff twenty-five times

and not once did he raise this issue with the staff.  *See* Tousignant Decl. at ¶ 7; Nepveu Decl.,

Exhibit "K."  Based upon this record, the Court finds that any temporary delay on the part of

Defendants in providing Plaintiff with a no-fish diet was not a serious medical need, and in any

case, Defendants did not know of and disregard this delay.  Accordingly, the Court **grants**

Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claims

against Defendants Tousignant and Buffman.


**H.      Sanctions**

In his opposition, Plaintiff asserts that, by serving a summary judgment motion in lieu of an answer for Defendant Kienert, AAG Nepveu has violated a court discovery order; and, therefore, the Court should sanction her. *See* Dkt. No. 75 at pp. 2-14. Magistrate Judge Treece issued the relevant discovery order on October 25, 2004. *See* Dkt. No. 65. In ruling on Plaintiff's motion to compel discovery, Magistrate Judge Treece concluded that, because at that time Plaintiff had not yet served Defendant Kienert with process, he could serve a set of interrogatories on Defendant Kienert thirty days after a response to the complaint was filed on behalf of Defendant Kienert. *See id.* at p. 4. Plaintiff served Defendant Kienert on November 8, 2004. *See* Dkt. No. 68. On November 2, 2004, in response to AAG Nepveu's request, Magistrate Judge Treece set Defendant Kienert's response deadline for December 31, 2004, and extended the motion-filing deadline for all other Defendants to the same date. *See* Dkt. Nos. 66-70. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a defendant may move for summary judgment "at any time." Fed. R. Civ. P. 56. Thus, AAG Nepveu asserts that she acted in good faith and with the understanding that no outstanding discovery order was in place and that summary judgment was an appropriate response to the complaint on behalf of Defendant Kienert.

Rule 37(d) of the Federal Rules of Civil Procedure authorizes a court to impose sanctions for a party's failure "to serve answers or objections to interrogatories . . . after proper service of the interrogatories," and further authorizes a court to "make such orders in regard to the failure as are just." Fed. R. Civ. P. 37(d). Under the circumstances of this case, the Court finds that sanctions against AAG Nepveu are not warranted; therefore, the Court **denies** Plaintiff's request for sanctions.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that Plaintiff's due process claims against Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire, based upon Plaintiff's allegations regarding his admission to SHU on July 1, 2002, are **DISMISSED AS FRIVOLOUS** pursuant to 28 U.S.C. § 1915(g); and the Court further

**ORDERS** that Plaintiff's due process claims against Defendants Rock, Daggett, and Canning are **DISMISSED WITHOUT PREJUDICE**; and the Court further

**ORDERS** that Plaintiff's First and Fourteenth Amendment claims against Defendants Kienert, Girdich, Dumas, White, Donovan, Canning, Donaldson and Roy, based upon his allegations that Defendants denied him access to the courts, are **DISMISSED AS FRIVOLOUS** pursuant to 28 U.S.C. § 1915(g); and the Court further

**ORDERS** that Plaintiff's retaliation claims against Defendants Canning, Tousignant, Cromp, and Girdich are **DISMISSED AS FRIVOLOUS** pursuant to 28 U.S.C. § 1915(g); and the Court further

**ORDERS** that Plaintiff's Eighth Amendment claims regarding the conditions of his confinement are **DISMISSED AS FRIVOLOUS** pursuant to 28 U.S.C. § 1915(g); and the Court further

**ORDERS** that Plaintiff's Eighth Amendment medical-indifference claims against Defendants Cromp, Donaldson, and Yaddow are **DISMISSED AS FRIVOLOUS** pursuant to 28

U.S.C. § 1915(g); and the Court further

  **ORDERS** that Plaintiff's request for sanctions is **DENIED**; and the Court further

  **ORDERS** that the Clerk of the Court enter judgment in favor of Defendants and close this

case.

**IT IS SO ORDERED.**

Dated: September 30, 2005
   Syracuse, New York

                  Frederick J. Scullin, Jr.
                  Chief United States District Court Judge